IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 6, 2017

**DEVAUGHN EDWARDS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-05320        J. Robert Carter, Jr., Judge**

_____

**No. W2016-02203-CCA-R3-PC**

_____

The Petitioner, Devaughn Edwards, filed for post-conviction relief from his convictions of facilitation of kidnapping, facilitation of robbery, and facilitation of aggravated burglary, alleging that his trial counsel was ineffective. The post-conviction court denied the petition, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Marty McAfee, Memphis, Tennessee, for the Appellant, Devaughn Edwards.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Dru Carpenter and Carrie Shelton, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

After the Petitioner and three co-defendants participated in a home invasion on Mud Island in Memphis, the Petitioner was charged with three counts of especially aggravated kidnapping, especially aggravated robbery, especially aggravated burglary, aggravated robbery, and employing a firearm during a felony. On direct appeal, this court summarized the proof adduced at trial as follows:

Tad Robbins testified that he was a lieutenant in the United States Navy and was living on Mud Island on April 11, 2012. That evening, he and his wife heard a commotion coming from a neighbor's house, and he saw a Lincoln automobile backed into the driveway of a nearby vacant house. He observed two men entering "quickly" into the garage and went out his back door because he thought "there was something weird." He noticed that the car was "running" and returned to his house to call 911. As he watched, the garage door opened, and he saw two men leaving a house carrying a television set, a guitar, and a bag of other items. Two more men came out of the house, and they "loaded up" in the car to leave.

Jaredan Braal testified that he was a mechanical engineer for Medtronic. On April 11, 2012, he was living on Mud Island and returned home "around 10:45 or 10:50 at night" from teaching a dance class. He pulled into his garage, which was in an alley behind his house. As he was unloading items from his car, he saw a vehicle in front of the neighbor's house behind him. One of the two men at the car said he wanted to ask Mr. Braal a question, adding that he was looking for a particular street. They were joined by another man who soon produced a pistol, which he pointed at Mr. Braal. Mr. Braal then threw down his cell phone and wallet and ran into his garage but was hit in the head multiple times and fell to his hands and knees. Two of the men then entered Mr. Braal's house, while a third kept watch on him. Mr. Braal's roommate was brought from the house and made to lie down beside him. After the men loaded their vehicle with items from the victims' house, they asked for the PIN number for Mr. Braal's debit card, and he made up a number. The four men then left, and the victims telephoned 911 from a neighbor's telephone. Mr. Braal was hospitalized for twelve days as a result of his injuries. He identified the [Petitioner] as the person who hit him with the pistol.

Frederick Krafcik, Jr. testified that he was living on Mud Island on April 11, 2012, and was employed by the University of Tennessee Health Science Center, working at St. Jude Children's Research Hospital. He said that, during that evening, he was on the bed in his room when the door

was kicked open and two men entered at pistol-point. They took different items, including cash, and ordered him to go downstairs to the garage, where he found his roommate already lying facedown and blood on the floor. He said that as "the criminals were still going back and forth in the house, removing items," he stayed facedown on the garage floor, as they ordered. After the men left, the two victims ran to neighbors for help, "knocking on doors, looking bloody and beaten up, [but] people weren't answering."

Mr. Krafcik said that he at first thought it was his roommate coming up the stairs, but then his door was kicked in. The man who came through the door pointed a pistol at him, and another man then came in, the two of them asking, "[W]here is the cash?" He said that the two men took his DVD player and computer, the cash from his wallet and, later, he discovered they had taken his cell phone. At gunpoint, he was made to go down the stairs to the garage [where he saw Mr. Braal lying face down on the garage floor. Mr. Braal's face was beaten and bloody.]

Mr. Krafcik said that at least three men came into the house, but "it sounded like there was a fourth person." He said that he had paid between $3000 and $3500 for the items the men took.

Officer Robert Forbert of the Memphis Police Department testified that he received a prowler call on April 11, 2012, to the victims' residence. Upon their arrival, officers found the door was open, the residence was ransacked, and there was a pool of blood in the garage. Officer Forbert learned that Mr. Braal was at a nearby address, where he went and found him on the floor, with others trying to stop the bleeding from his nose. Mr. Braal said his iPhone had been taken, and information was entered into Officer Forbert's iPhone to locate Mr. Braal's phone. An exact address was provided by the iPhone application, which was 2423 Manchester Road. Officer Forbert then went to that address, where he observed traveling south on the street a tan Lincoln Zephyr automobile, which matched the description the victim gave of the car the defendants were operating. Two African-American males were in the automobile, which

the officer stopped. The vehicle was being driven by the [Petitioner], whom the officer identified in the courtroom. At the residence, a male and female came to the door and were detained while a search warrant was obtained to search for the iPhone.

Officer Terrell Hunt of the Memphis Police Department testified that he was assigned to the Felony Response Unit. On April 12, 2012, he responded to a call to a residence on Manchester Road. A search warrant was obtained, and Officer Hunt entered the residence where he located a large television, matching the description of the one taken from the victims' residence. He also found at the residence an iPhone, a Mac 10 Notebook computer, a bulletproof vest, and a guitar. All of these were found in the bedroom of Adrian Henderson, one of the co-defendants.

Officer Justin Edward Sheriff, a crime scene investigator with the Memphis Police Department, testified that on April 12, 2014, he was called to photograph a 2006 Lincoln Zephyr and items taken from it at an auto shop located at Alcy and Manchester. He took photographs of the vehicle and a wine bottle which was inside it.

Sergeant Velynda Thayer of the Memphis Police Department testified that on April 12, 2012, she was assigned to investigate the home invasion and robbery that occurred on Mud Island, for which two suspects, one of whom was the [Petitioner], were in custody. She advised the [Petitioner] of his Miranda rights, which he waived. The [Petitioner] gave a statement, admitting his participation in the crimes.

Patrece Edwards, the [Petitioner's] mother, was the only witness testifying in his behalf. She said she had not known that he was spending time with the three co-defendants.

State v. Devaughn Edwards, No. W2013-02009-CCA-R3-CD, 2014 WL 6792747, at *1-3 (Tenn. Crim. App. at Jackson, Dec. 3, 2014). The jury convicted the Petitioner of three counts of facilitation of kidnapping, two of which were merged; two counts of facilitation of robbery, and one count of facilitation of aggravated burglary. Id. at *1. He received a

- 4 -

total effective sentence of sixteen years. Id. On appeal, this court affirmed the Petitioner's convictions and sentences. Id.

Thereafter, the Petitioner, acting through counsel, filed a timely petition for post-conviction relief and an amended post-conviction petition, alleging numerous ways in which his trial counsel was ineffective. Notably, the Petitioner contended that trial counsel was ineffective by

> failing to raise issues at trial regarding the lack of physical evidence tying [the Petitioner] to the crime, the height differences between the victim's description of the assailant and [the Petitioner's] physical description, that other similar offenses occurred in the same area by four individuals after [the Petitioner] was incarcerated, not raising doubt on [the Petitioner's] statement by questioning the police regarding their interrogation tactics, not questioning witnesses and presenting photographs establishing stolen items were not in [the Petitioner's] vehicle following his arrest, not obtaining cell phone records for [the Petitioner], not obtaining video surveillance of [the Petitioner's] whereabouts, not questioning an officer regarding statements the officer made in the hallway during trial, and by failing to present evidence regarding the physical impossibility of tracking a cell phone when the battery was dead.

At the post-conviction hearing, the Petitioner's trial counsel testified that he represented the Petitioner at trial; however, the Petitioner's mother was unhappy with his representation and retained another attorney to represent the Petitioner during sentencing, the motion for new trial, and direct appeal.

Trial counsel acknowledged that at trial, the State's witnesses testified the police had found the defendants by tracking a cellular telephone stolen from one of the victims. Trial counsel thought the telephone's owner had said that the telephone's battery appeared to be "dead." Trial counsel conceded that he did not inform the jury a cellular telephone with a dead battery could not be tracked.

Trial counsel recalled that after a lengthy hearing, the trial court denied the defense's motion to suppress the Petitioner's statement and ruled the statement would be admissible. The trial transcript, which was included as an exhibit at the post-conviction hearing, reflects that the Petitioner's statement provided in pertinent part:

We first met up at the store lot at Alcy and Perry. And Adrian [Henderson] was like, I need you to take me somewhere. He gave me ten dollars and we went to the gas station. We got some gas and then we got on the expressway. Adrian [Henderson] was directing me on where to go. We took the Little Rock exit and got off on Danny Thomas and then we made that first left at the light. Then we went up the bridge and then we made a right into where some big houses were. We parked the car and saw a silver Volkswagen pull up and pull into his garage. He walked out of the garage and got his trash can and pulled it up towards his house. Adrian [Henderson] got out and said something to the man. G[l]en [Wynn] was standing outside of the car and me and Martrell [Holloway] were still sitting inside of the vehicle. Adrian [Henderson] hit the man with the pistol and then Glen [Wynn] put his arm around the man's neck and pulled him into the garage. Glen [Wynn] put his hand over the man's mouth to keep him from screaming. I stayed in the car. I couldn't see after they took the man in the garage so I pulled the car up and I parked it in the driveway next to his. I left the car running. Martrell [Holloway] and I got out of the car and Martrell [Holloway] told me to just stay in the garage with the man and watch him. They went through the house and started coming out with stuff. They would come to the door of the garage and set stuff out. They found an upstairs and I heard Glen [Wynn] say to Adrian [Henderson] that the door was locked. Then I heard boom like they kicked the door in. I heard a man scream and then they brought him downstairs and told him to lay down by his friend. They told me to watch them and make sure they didn't move. They finally got all the stuff and we packed the car. I popped the trunk and Adrian [Henderson] was stuffing stuff in the trunk. We got in the car and they told me to pull off. After we left I took Martrell [Holloway] home to Tulane Apartments. Then I dropped Glen [Wynn] off on Alcy at his house. Then I took Adrian [Henderson] to his house and we took the stuff inside of his house. Then we got back in the car and went to the store to get some cigarettes. When we came back to his house is when we saw the police. They pulled us over and saw the wine bottle in Adrian[ Henderson]'s hand. They pulled him out of the car and started asking him questions then we ended up here.

After the trial court's ruling on the motion to suppress, trial counsel advised the Petitioner "to embrace the statement and try to mitigate the damage in regards to what his role was that evening." Trial counsel said:

> I've always had the theory or the practice of pick your battles. And I did not want to have a defense of mitigating [the Petitioner's] role in this scheme, yet still questioning every little thing about this case. I did not – it was my opinion that that would take away the credibility of his argument that he had a very minor role in the offense and that's what I wanted the jury to focus on. And I spoke about that with [the Petitioner] and he agreed.

Trial counsel said that his approach explained why he did not challenge the lack of physical evidence of the Petitioner's involvement, including a wine bottle that did not have the Petitioner's fingerprints; why he did not raise a complaint regarding missing photographs; and also explained "75 to 80 percent of the [issues the Petitioner] listed in [his] petition." Trial counsel opined that his strategy was successful, noting that the jury convicted the Petitioner of the lesser-included offenses of facilitation instead of the charged offenses.

Trial counsel said that he "vigorously fought" a motion to suppress the Petitioner's statement based upon the way the defendants were treated by the police, explaining that during the three hours the defendants were kept in patrol cars at the scene, they were not allowed a bathroom break and that the police refused to allow the Petitioner to sleep until he agreed to give a statement. Trial counsel noted that during trial, the State's witness Glenn Wynn testified to a version of events that was identical to the version of events in the Petitioner's statement. Trial counsel advised the Petitioner that Wynn's testimony did not help the State's case but did help the Petitioner's case.

Trial counsel said that at least one of the victims was badly injured during the offenses. Although the Petitioner did not have a preliminary hearing, he was present during the preliminary hearing of his co-defendant, Martrell Holloway. At that hearing, the injured victim was unable to identify the Petitioner as a perpetrator. The victim did, however, identify the Petitioner at trial.

Trial counsel said that he did not recall if the Petitioner "had a chipped tooth that was prominent" during his representation. Trial counsel said that he did not question the victim about whether the Petitioner had a chipped tooth but that he successfully cross-examined the victim regarding whether the Petitioner had a gun, which was why the jury dismissed the counts that alleged the Petitioner possessed a gun. Trial counsel noted that

the injured victim had been hit with a gun and that he claimed the attacker was approximately five feet, seven inches tall. Trial counsel did not cross-examine the victim regarding the discrepancy between the Petitioner's height and the description of the perpetrator because he did not want to "nit-pick" the State's proof of identity given the Petitioner's statement admitting his involvement in the crimes. Nevertheless, trial counsel stressed to the jury that the Petitioner's role in the crimes was minimal and that the Petitioner had no knowledge that the burglary, assault, and robbery were planned.

Trial counsel acknowledged that the State's theory was that many of the stolen items were removed from the victims' residence and put into the defendants' car, which was later impounded by the police. While the car was in the impound lot, the Petitioner's mother took photographs of the car. Trial counsel acknowledged that the Petitioner's mother contended that the trunk was full before the crimes and that therefore the defendants could not have put any stolen items in the trunk. However, trial counsel disagreed and thought the trunk could have been filled with other items after the offenses. At trial, the defense stressed that the majority of the stolen items were found at co-defendant Adrian Henderson's residence and that the Petitioner received only gas money from the crimes.

Trial counsel said that the Petitioner's mother may have asked him to obtain telephone records to pinpoint the location of the Petitioner's cellular telephone on the night of the crimes; however, the Petitioner never requested the records. Trial counsel said that during the course of his representation, he repeatedly asked the Petitioner if he wanted counsel to do anything counsel had not done, but the Petitioner did not request that counsel do anything else.

When asked if he was "aware that one of the officers had made comments in the hallway that the evidence being brought into the courtroom was not the evidence they had actually seized on Manchester Street," trial counsel responded, "I've never been aware of that. The first time I saw that was in your petition." Trial counsel acknowledged that he and the Petitioner's mother talked about similar robberies occurring in the area after the defendants were arrested. Trial counsel did not, however, cross-examine police officers about the other crimes "based upon the similar strategy that I've already told you."

On cross-examination, trial counsel said that at the time of trial, the Petitioner was facing indictments for four robberies unrelated to the crimes for which he was on trial. Trial counsel filed a motion to suppress the Petitioner's statement, his arrest, and "everything that came from that arrest." The suppression hearing was lengthy but unsuccessful. At that point, trial counsel advised the Petitioner that his statement would be admissible at trial. In the statement, the Petitioner said that co-defendant Henderson provided gas for the Petitioner's vehicle so the Petitioner would drive all of his co-defendants to Mud Island and that co-defendant Henderson knew the security code for

the residence. Trial counsel further advised the Petitioner that the State intended to have at least one of the co-defendants testify against him and noted that the Petitioner had been apprehended while with Henderson. Based upon the foregoing, trial counsel advised the Petitioner that the best trial strategy was to mitigate his role in the offenses. Trial counsel said that his closing argument emphasized that "the State put on a hell of a case against Adrian Henderson, but not against [the Petitioner]." Trial counsel said that he told the Petitioner that Wynn's testimony, which was identical to the Petitioner's statement, was "a gift" and that "the door was cracked open for us to put up a good defense and to mitigate this. And [the Petitioner] agreed."

Trial counsel recalled that the Petitioner faced a total effective sentence of one hundred and forty-one years. He and the Petitioner discussed whether the Petitioner would testify. After Wynn's testimony matched the Petitioner's statement, they decided to rely upon the Petitioner's statement and not to subject the Petitioner to cross-examination.

Upon questioning by the post-conviction court, trial counsel stated that he "did not think that [the Petitioner] was going to get a good result [at trial] and so [trial counsel] did meet with him quite often to see if he still wanted to go forward with the trial." Trial counsel reiterated that he tried to mitigate the Petitioner's role in the offenses and to separate the Petitioner's role from that of his co-defendants. Trial counsel said that the Petitioner agreed with the trial strategy.

On redirect examination, trial counsel said he recalled that the trial court instructed the jury not to use the court's reactions as proof in the case. Trial counsel thought the court gave the instruction after the judge "raise[d] his eyebrows" when he disagreed with the way trial counsel phrased a question. Nevertheless, trial counsel asserted that the trial court's reactions did not interfere with the jury's ability to judge the case fairly.

The Petitioner's mother, Patrice Renee Edwards-Bradford, testified that she assisted in the preparation of the Petitioner's defense and that she was present at every court date. She and trial counsel talked about the police's ability to track the defendants with the victim's stolen cellular telephone. She knew that the victim had said the telephone's battery was dead, and she asked trial counsel how the State could track the telephone if the battery was dead. She told trial counsel that she had called several cellular telephone companies and was told that a cellular telephone with a dead battery could not be tracked. She said that during trial, she did not hear trial counsel cross-examine any witness on whether a cellular telephone with a dead battery could be tracked.

Edwards-Bradford said that trial counsel informed her that the State accidentally recorded over some of the crime scene photographs. At trial, "[i]t was brought up that

there were crime scene pictures and the ones that they introduced were not the ones that [Edwards-Bradford] asked [trial counsel] about." Trial counsel did not cross-examine any of the witnesses about the missing photographs.

Edwards-Bradford recalled that the Petitioner, Henderson, Holloway, and Wynn were charged with the Mud Island crimes. The Petitioner did not have a preliminary hearing, but two of the co-defendants had a preliminary hearing. At the co-defendants' preliminary hearing, the victim was asked if he could identify the person who attacked him. Although all four suspects were in the courtroom, the victim was unable to identify any of them.

Edwards-Bradford said that one of the Petitioner's front teeth was chipped almost in half during a swimming pool accident in 2010 and that it was a distinctive, noticeable feature. Edwards-Bradford said that the victim described the attacker as five feet, seven inches tall. She asserted that the Petitioner was six feet, one inch tall.

Edwards-Bradford knew that the police seized the Petitioner's car when he was arrested and that the State theorized the Petitioner "carried away numerous bulky items from the crime scene in his car." Thereafter, she went to the impound lot to retrieve the car. While at the impound lot, she took photographs of the car. She stated that the photographs showed that "the trunk was full to capacity," which belied the State's theory that the stolen items were put in the Petitioner's car. She gave the photographs to trial counsel.

Edwards-Bradford said she and trial counsel talked about similar crimes that occurred in the Mud Island area after the defendants were arrested. After Edwards-Bradford gave trial counsel the information about the crimes, he printed an article about the subsequent crimes. However, he did not use the similar crimes as part of his defense strategy.

Edwards-Bradford said that she spent part of the trial in the hallway of the courthouse because she was a potential witness. While she was in the hallway, she overheard an officer "coaching" one of the victims on how to testify. At the post-conviction hearing, she did not specify what the officer told the victim to say, stating only that the officer told the victim, "'[T]his was a heinous crime and you need to make sure he pays.'" At trial, she told trial counsel about the conversation, and, during a jury-out hearing, she told the trial court and the State what she had overheard. The trial court found that any alleged coaching was irrelevant because the victim did not testify in the manner suggested by the officer.

Edwards-Bradford said that she also told trial counsel that she heard a different officer tell a woman in the hallway that he did not feel "comfortable" testifying about

retrieving property from Manchester because the only thing the police recovered from that location was a bulletproof vest. Nevertheless, the officer

> still came in and testified under oath that they recovered all this property from Manchester. But when [the prosecutor] asked him, "Well, where did you get the property that you say you seized," he said, "We got it out of the property room."
>
> So they returned the victim's property out of the property room that matched or was similar to what he said was stolen, but [the Petitioner] was arrested because of what they say they found on Manchester.

Trial counsel informed Edwards-Bradford that getting the officer to retract his statement would be difficult.

Edwards-Bradford also raised issues regarding the impartiality of the trial judge. She said that during trial, the trial court instructed the spectators "not to speak, not to say anything, no phones, no this, no that." She said that, despite this caution, "every time any compliment or anything positive was said about [the Petitioner, the judge] made a motion or a gesture." She said that the judge also indicated to the State when he thought an objection should be made. Edwards-Bradford said that she talked with trial counsel about the trial court's behavior.

On cross-examination, Edwards-Bradford acknowledged that she hired trial counsel to represent the Petitioner. She said that the Petitioner had difficulty communicating with trial counsel because trial counsel met with the Petitioner only once prior to trial. Accordingly, the Petitioner told trial counsel to comply with the Petitioner's mother's requests because she was speaking on the Petitioner's behalf. Edwards-Bradford told trial counsel to obtain the Petitioner's cellular telephone records and to get videos from McDonalds, the gasoline station, and any other places the Petitioner claimed to be on the night of the crimes to prove he was not on Mud Island. She said that trial counsel refused to comply with her requests.

Edwards-Bradford said that trial counsel discouraged the Petitioner from testifying. Trial counsel "pleaded" with the Petitioner to accept a plea agreement, but the Petitioner refused. Edwards-Bradford said that trial counsel's "strategy was he wanted [the Petitioner] to take the deal. That was the only thing that – he didn't discuss tactics or anything." Edwards-Bradford said that the Petitioner "even took the stand and had the Judge explain to him that he was facing a 125 years and he still refused to take the deal."

The Petitioner testified that trial counsel alleged during a motion to suppress that one of the defendants asked the victim for directions, and the victim responded that he could not get directions from his cellular telephone because the battery was dead. The Petitioner asserted that he and trial counsel did not discuss whether to challenge the State's ability to track the defendants if the battery was dead.

The Petitioner said that he and trial counsel discussed whether to point out to the jury that no physical evidence linked the Petitioner to the stolen items. The Petitioner agreed with trial counsel's suggestion not to pursue that avenue at trial, explaining that he was not educated about the law and trusted counsel's advice.

The Petitioner said that he waived his preliminary hearing but that he was present for the preliminary hearing of one of his co-defendants. Both of the victims testified at the preliminary hearing, but neither was able to identify any of the perpetrators.

The Petitioner acknowledged that he gave a statement to the police. Trial counsel filed a motion to suppress the statement based upon the police's poor treatment of the defendants. The Petitioner said that he knew the details of the crimes because he picked up the co-defendants immediately afterward, and they told him what had happened. He said that he was scared when speaking with the police because he had never been in trouble before this incident. He tried to tell the police that he had nothing to do with the crimes, but the police did not believe him and continued to question him. The Petitioner said that it was "a while" before he gave a statement that the police accepted. During the interview, he put his head down on the table and went to sleep, but he was awakened by several officers. As the interview progressed, different officers questioned him using different strategies. One of the officers told the Petitioner that he had spoken with the Petitioner's mother and that she wanted the Petitioner to tell the police about the crimes. At that point, the Petitioner "broke down and . . . told them everything that [he] knew."

The Petitioner said that in 2010, he accidentally chipped a tooth diving into a pool. His tooth was still chipped in 2012. The Petitioner said that he was six feet, one inch tall; that the victim said his assailant was five feet, seven inches tall; and that trial counsel never raised the height discrepancy at trial.

The Petitioner said that he was nineteen years old when he was arrested. At that time, he was working for a temporary service. When asked what he had been planning to do with his life, he said that he had liked to "take old cars and build them up and auction them off" and that he had been trying to get into "UTI, University of Technical Institute" in Houston, Texas.

The Petitioner acknowledged that in his statement, he admitted involvement in five robberies. He asserted, however, that he did not participate in five robberies and that

- 12 -

he made the statement because he was scared and because the police refused to accept that he was not involved in the crimes. He explained, "So I said whatever I had to say or I felt that I had to say to get out of there." When asked how he knew what to say, the Petitioner stated that the police told him details about the crimes and "were just like telling me what I did."

The Petitioner said that trial counsel advised him not to testify because counsel feared the State's cross-examination would cause the Petitioner to appear untruthful. The Petitioner trusted trial counsel and agreed not to testify.

On cross-examination, the Petitioner denied that the police told him what to say in his statement. The Petitioner got the details in his statement "secondhand" from his friends, and he heard the details "several times . . . from all three of them." The Petitioner said that he picked up the co-defendants because they needed a ride and offered to give him gas money. The Petitioner said that he knew the details of the other robberies because his friends told him about them.

At the conclusion of the hearing, the post-conviction court held that the Petitioner had failed to establish that his trial counsel was ineffective. On appeal, the Petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner raises all of the claims of ineffective assistance raised in the trial court. Initially, we note that the Petitioner did not submit his cellular telephone records or any surveillance videos in order to challenge his whereabouts on the night in question. Petitioner has failed to show what the evidence would have been. We may not speculate on what benefit, if any, this evidence might have offered to the Petitioner's case. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Accordingly, the Petitioner has failed to demonstrate prejudice.

Further, the post-conviction court found that although the Petitioner and his mother stated the victim had said his cellular telephone had a dead battery, the trial transcript reflects the victim testified his telephone had a "low battery." The court stated that the Petitioner did not adduce any proof the police could not track a cellular telephone with a low battery. We agree. Moreover, trial counsel noted, that introducing the records could have been detrimental to their mitigation strategy. The Petitioner is not entitled to relief on this claim.

The Petitioner also contends that trial counsel failed to question an officer about contradictory statements the officer made regarding the location where evidence was recovered. Trial counsel, whose testimony the post-conviction court implicitly accredited, testified that he was unaware of the allegations prior to the post-conviction proceedings. The Petitioner is not entitled to relief on this claim.

- 14 -

Finally, we turn to the Petitioner's remaining claims, namely that trial counsel failed to challenge the identification evidence and the lack of physical evidence tying the Petitioner to the crimes, trial counsel's failure to introduce evidence that similar crimes occurred after the crimes for which the Petitioner was on trial, trial counsel's failure to inform the jury that the photographs of the crime scene had been lost, and trial counsel's failure to question the reliability of the Petitioner's statement. Trial counsel testified that after the trial court overruled the motion to suppress the Petitioner's statement, he decided not to challenge identity and devised a strategy to use the statement in order to minimize the Petitioner's role in the crimes. Counsel discussed the strategy with Petitioner and Petitioner agreed. In light of the details in the Petitioner's statement, counsel did not want to "nit-pick" the State's evidence, opining that to do so would cause the jury to question the defense's theory that the Petitioner's role in the crimes was minor. The post-conviction court found that trial counsel advised the Petitioner of the trial strategy, that the Petitioner agreed with the trial strategy, and that the strategy was successful in that the Petitioner was convicted of lesser-included offenses instead of the charged offenses. The court further observed that the strategy was also successful in that the "Petitioner had a total possible exposure in all of his cases in excess of one hundred years. The state's offer to settle on an agreed upon sentence was twenty-two years. [The Petitioner ultimately] received sixteen years." The post-conviction court held that trial counsel was not ineffective. The evidence does not preponderate against the ruling of post-conviction court.

## III.  Conclusion

Finding no error, we affirm the judgment of the post-conviction court.


_____
NORMA MCGEE OGLE, JUDGE

- 15 -